Number 23-9517. Number 23-9517. Good morning. May it please the court. Michael Pusiteri on behalf of the petitioners. This is a straightforward case of construction where the plain language of the statute and regulation at issue dictates the result. This plain language analysis defeats both the pilot program and the ALJ's finding that Fawcett was exempted from Section 921C's comparability showing. Let me stop you and get the pilot program perhaps disposed of. Did the agency rely on the pilot program in reaching its decision? Do we really have to be necessary to this decision? Because what we have here is a situation where the agency has subverted its own regulations to ensure that Dr. Gagin had the final word before the district director. What happened... Did the agency rely on what he said in the final word? Maybe it was wrong to allow him to do it, but it's not unusual for a judge to be particularly liberal in allowing things to be considered, but then doesn't consider them in reaching the decision. Yes. In fact, they did rely upon it because when Dr. Gagin... Dr. Gagin issued three reports, basically had three says in the matter. He had his initial report. He was deposed. When he was deposed, his deposition testimony I submit was devastating. He conceded that it could well be that the entirety of this gentleman's impairment was due to non-occupational factors. Dr. Gagin happened to think they were tobacco-related. Our doctors did not. But his testimony during his deposition conceded that everything that he said was tantamount to a guess, and that, again, it may well be that the entirety of this gentleman's arterial blood gas problems were due to, again, non-occupational... This isn't answering the question. The question is the third report that was under the pilot program. Yes. The third report followed that deposition testimony, and that third report basically rehabilitated and took back concessions that he made during his deposition. I believe the question was, is there anything in the ALJ's opinion that suggests that it relied on the report that was submitted as part of the pilot program? Yes. The ALJ credited Dr. Gagin, and he did so by basically adopting the rationale stated at DX21, which was the pilot program report, and at DX20, which was the initial report, basically giving those precedents over the features of the deposition testimony that, frankly, contradicted them. Yes, there was a prejudice here, but again, I submit as well that the prejudice that we're primarily concerned with is the fact that our folks were disenfranchised from having any say because the APA formalities, which changed the regulations, the pilot program explicitly contravenes and contradicts the regulations definitions, and it does so in a way without notice and comment rulemaking, and that was prejudicial. The sugar cane growers case makes that very clear, that when you dispense with APA formalities, it is essentially the case that that is prejudicial, and that's here. Well, you don't make any arguments that would be necessary to strike down the entire pilot program. I mean, there's a series of things we have to look at. None of those are addressed in the brief, so I think what Judge Hartz is focusing on is if your argument is limited to this case, you've got to show prejudice. Absolutely. And not just prejudice because there's an APA violation in terms of rulemaking. Well, I think the prejudice is, first of all, related to the APA disenfranchisement, but also as it relates to this particular case. Again, what happened was Dr. Dagan got a third bite of the apple, and he was able to rehabilitate his devastating deposition testimony because the agency submitted that. Did the board's opinion ever refer to this report? The board's opinion effectively just said substantial evidence good enough for us as it relates to the medical merits, and actually that's a problem as well. Well, I assume that he was able to rehabilitate if neither the ALJ or the board made that finding. Well, they didn't say the word rehabilitate, but they did accept as gospel the findings, the statements that he made about the origins of this gentleman's arterial blood gas problems, which were implicit, which were explicitly stated in his pilot program report and his original report, but which effectively contravened his deposition testimony. So that's where we get the prejudice. Well, the ALJ relied on his original report. That's what it's looking at and quoting, right? You can't point to anything in that opinion where he says, I'm looking at the subsequent report that was submitted with the pilot program. No, I think that's a fair point, but I also think that this ALJ's decision in particular was all over the place. At some points, they say that we rebutted the presence of clinical pneumoconiosis. Elsewhere, they said the precise opposite. The ALJ never made an affirmative finding that Dr. Gagin ruled out a total disability due to pneumoconiosis finding, and that's why if you folks agree that the 15-year presumption was improperly applied here, you necessarily have to remand for further fact-finding because there are features that are essential to a disability finding was unnecessary here. In fact, that's a real problem because there is not even a delegation to the Secretary of Labor to do anything with Section 921C. There is a delegation to promulgate rules as necessary to implement the statute, right? Yes, 936C says that. Excuse me, 936A says that, but again, this is on all fours with Marlowe. In Marlowe, we have the Fair Labor Standards Act. There were tons of instances where the Secretary of Labor was empowered to promulgate rules that, for instance, dealt with child labor, minimum wage, things like that. In fact, in 203M, there's something even more explicit where they're talking about defining wages. There, they say the Secretary shall decide, for instance, whether room and board count as wages, but what they did not do in Marlowe is they did not say you can define tipped wages, and I submit that this case is an even stronger example of non-delegation than Marlowe because, at least in Marlowe, that concept, tipped wages, you can envision a gap. There's some technical expertise that perhaps the Secretary would understand what a tipped wage is, where a layman would not. Here, what we're talking about is common prepositions in and underground, and in fact, when we go to 921C... Let me interrupt you again. I have two questions. One is, should we abate this case until the Supreme Court rules on Loper? We don't know what's going to happen with Chevron deference at this point, and I don't know right now how much I'm supposed to rely on regulations. Sure. What's your opinion on that? Judge, that's a very fair question, and I think the answer is abating this case would only be appropriate if the Secretary bats a thousand on the first two questions, which is, Chevron step zero, was there delegation in the first instance? If there's not, and I contend there's not, then you don't have to wait for Chevron, and then secondly, you have to find that this statute is unambiguous. They say it's unambiguous. They are not claiming ambiguity, and they say it's unambiguous, and that unambiguously means around, and that you find, number one, that there is delegation, and I lose that, and you find, number two, that there is ambiguity, and I lose that, and by the way, no one is arguing for ambiguity. Then theoretically, I think the best course is to hold this in abeyance, pending resolution of Loper and relentless. How do you deal with the history of the statute? Before the statute covered above-surface mining, there was a regulation that specifically included within underground mining the facilities above ground associated with it. After that, Congress amends the statute. Now, there's plenty of authority, I think, maybe you can distinguish it, that Congress is presumed to know how a statute is being interpreted when it reenacts it. How do you deal with that problem? That's precisely right, Judge, and actually, the legislative history, again, setting the plain language aside, actually very much supports us. The one instance where the Secretary makes a point about the 1971 definition of an underground mine to refer to things where facilities above the surface where coal is processed. Well, that's a processing plant. Mr. Fawcett was not covered under that 1971 understanding because he did not work in a process. The 1972 regulations, the regulatory history made very clear that Section 92-743 of the 1972 legislative history, Congress stated existing law limits the program to underground miners, and that's why it struck the word underground in 1972 to recognize But that's not the point. The point is, what did they mean by an underground coal mine? Sure. And I didn't recall, you say that the regulation that talks about the mine including surface facilities was limited to processing facilities? No, 1971, there was no regulation in 1971. Congress understood that coal mines, again, 1971, an underground coal mine was the word. They didn't strike that word until 1972, and they did that to ensure that all surface miners could be eligible for black loan benefits. We agreed with that. And they also agreed that an exceptional subset of surface miners could show through the 15-year presumptions additional acts, 921C's additional acts for the 15-year presumption, but only if they could show comparability, which is exceptional. And in fact, Congress understood that the vast majority of surface miners would not be able to get benefits at all. They looked at industrial hygiene and cohort studies and so on to make that conclusion we cited in our brief, but what they said was we have to leave open at least the possibility that some exceptionally dusty surface conditions might qualify for the 15-year presumption, and that's why they did what they did. Counsel, your argument about how we read 921C4 has been made before. Are you aware of any courts that have sided with you or favored your argument here? No, and so you're basically asking about a circuit split. There's exactly one published decision. I see my time is winding down, and I'd like to reserve some time for rebuttal, but I'd like to address Ramaj first of all. That is the only published case that talks about this. And Ramaj, effectively what they did is they looked at 802H, and they said, well, that general definition of a garden variety coal mine seems pretty similar to what the Secretary's doing when they were reinterpreting that to say, garden variety coal mines and underground coal mines have exactly the same definition. And so they just sort of quoted, they cited to Kuhn, which just reflexively cited to Alexander. They said, well, 802 and this new regulatory definition at 101A30, they look pretty similar. They must be rational. And in fact, they're not rational at all. Because if you graphed 101A30's definition of an underground coal mine into section 921C, that completely eviscerates the statute. It makes it nonsense. Because under that provision, under that reading, that all garden variety surface miners are entitled to the 15-year presumption as so long as they can show that the conditions they work in are substantially similar to the conditions on or around an underground mine, on the surface of an underground mine, that eviscerates section 921C's additional ask. It renders that entire definition surplusage. It makes no sense. And it basically obviates the entire comparability standard for everybody. Because every garden variety surface miner can say, my conditions are exactly the same as the outdoor conditions adjacent to an underground mine. Because it's exactly the same thing. Again, I'd like to reserve the rest of my time for Bob. Thank you. Good morning. May it please the Court. My name is Amanda Torres. I represent the Federal Correspondent, the Director of the Office of the Workers' Compensation Programs. The Director requests that this Court deny the employer's petition for review. I will be addressing two issues today. First, whether a miner's work above ground at an underground coal mine qualifies for the rebuttable presumption without a comparability analysis. And second, whether this Court should address the employer's challenge to the supplemental report program. And if so, whether the program is authorized by the Act in implementing regulations. Because employer addressed the supplemental report program first, I'll go ahead and address that first also. This Court need not address employer's challenge to the program under a harmless error analysis. The Board at footnote 13 specifically stated that it was not going to reach the issue because there was substantial evidence in the record, specifically employer's own doctor's opinion, Dr. Farney, to establish total disability through physician opinion. Not to mention the fact that the Board elsewhere stated that it was affirming the finding of total disability on the arterial blood gas evidence as unchallenged on appeal. This Court has stated that it must uphold an administrative decision absent the petitioner showing a substantial right to prejudice. It cannot make that showing here because without Dr. Gagon's supplemental report, there is still substantial evidence in the record to establish total disability, especially in the eyes of the fact that a claimant only needs to establish total disability through one method, not multiple. For those reasons, we would ask that this Court not address the employer's challenge to the supplemental report program. Turning back to that first issue, whether a miner's work above ground at an underground coal mine counts towards the 15-year requirement for the rebuttable presumption. The plain meaning of the statutory language at both 802 H2 and 921 C4 make it clear that a miner's work above ground in an underground coal mine counts as a miner's work in an underground coal mine for purposes of the 921 C4 presumption. At 802 H2, Congress defines a coal mine to include property under, upon, or above the surface of such land, and at 921 C4, the Court delineates between two types of mines, not types of miners. It distinguishes between what I'll refer to as Category 1 mines, underground coal mines, and Category 2 mines, a coal mine other than an underground mine. Only an individual's work in those types of mines has to show substantially  What counsel seemed to be suggesting, though, is if we encompass all these other facilities above ground as part of the underground mine, then an above ground miner will always be able to show comparability. And that would essentially eliminate that requirement in the statute. Maybe I misunderstood him, but I thought that was the point he was making. Employer's challenge requests that this Court treat Mr. Fawcett and miners like him who are above ground at an underground coal mine site as miners in that second category. But we know from the record in this case that Mr. Fawcett was always at the same, in fact, the entire 24 years was at the same exact underground coal mine site at different, yes sir? I'm not talking about the facts of this specific case. The point is if we interpret an underground coal mine the way you're suggesting, then the comparability requirement will always be met, and that doesn't make sense. If your definition leads to essentially eviscerating the comparability requirement, then we might wonder about the validity of your definition. How do you respond to that? The regulatory definition of an underground coal mine at 725-101-8A30 defines an underground coal mine to include the property pertinent thereto. There's no evisceration of the 921-C4 distinction, because there will still be that second category of mines, the typically strip mines. But for purposes of this type of relief, the worker just needs to show that he has spent this much time in conditions comparable to those in an underground mine. And that would always be satisfied if we include in an underground mine some business office on the surface. So that would be a result that would be irrational. So how can your definition be satisfied? How can your definition not lead to eviscerating any comparability requirement? It doesn't eviscerate it because the comparability requirement is four years worked in a coal mine other than an underground coal mine. Yeah, but it's got to be comparable to the conditions in an underground mine. And if conditions in an underground mine could be conditions in an office above an underground mine, then every worker in a non-underground mine would satisfy the comparability requirement. Not necessarily. That's why there's the regulation at 17305B2, which states that substantially similar conditions are those where there's regular coal dust exposure. So there would still be a showing that's necessary for the miner in those Category 2 mines. I think Judge Hartz is talking about the miner in the Category 1 mine. The miner in an underground mine who's working above ground in an office. The concern is that that miner will be treated, will be presumed if they work there 15 years, that their disability is caused by coal dust. Whereas you have a person working for 15 years in an office at an above ground coal mine that has to make a different showing that this person is exempted from. Am I explaining it? I think so. And so the question is, why the difference? The difference is not only because the plain meaning of the statutory language and the fact that the word in, as the Oxford English Dictionary defines it, is within the bounds of, is that the legislative history of the Act, Mr. Fawcett was always included as a miner in an underground coal mine. When the Act was created in 1969 and it defined a miner as one that is in an underground mine and the later regulatory definitions included a miner and an underground mine, whether above or below. And then under Miles V. Apex, we're safe to assume that Congress is aware of the existing law at the time that it, the state of the law at the time that they create new legislation. Which was in 72, is that right? The 1972 amendments, yes. In Senate Report 92-743, Congress acknowledged the fact that, and I hope that this isn't a concern about above ground and underground coal mines, but Congress acknowledged in that Senate report that miners that were above ground and underground mines were eligible for benefits under the existing state of the law. Which was an existing state of the law included regulations that were very specific about that. Yes. So I'll ask the same question. We don't know how much weight to give those regulations. Should we abate and find out what the Supreme Court has to say in low court? No, this court should not abate. The reason why is, first, the language is unambiguous, Congress's intent is unambiguous, and therefore there's no need to give any Chevron deference. And even so, Chevron deference is still the law of the land. We're not going to rely on that too much right now. But I thought your point was different. I thought it wasn't that we deferred to the pre-1972 regs under some Chevron theory. I thought it was when Congress enacted the 72 amendment, it's presumed to know how the regulations interpreted the same language in the earlier statute. So it's not a Chevron issue as I understand it. Exactly right, Your Honor. This is not a Chevron issue. We are saying that the plain meaning of the statutory language, the authority that Congress gave to us, the broad authority under 936A to promulgate regulations, and the legislative history altogether support the fact that in an underground coal mine encompasses work above and below the surface of that mine site. The court noted earlier the published decision in Ramage, and we would just note that both Ramage and the Sixth Circuit and Coon and unpublished decisions, but also dealing with the understanding of in an underground coal mine support the same holding that we're requesting in the present case. Not much analysis in those cases. That is true, Your Honor. There's not much analysis regarding the—both of those courts gave Chevron deference. They didn't need to. They didn't give a fulsome evaluation of the statutory language and the legislative history, but we're requesting that this court does engage in that history to come to the understanding that in an underground mine encompasses miners' work like Mr. Fawcett. At this time, I'm going to cede my time to Claimant's Counsel, Mr. Alston. Oh, I'm sorry. I didn't— Apologies. Dividing time is always— It is always difficult watching the clock. Sometimes impossible. Go ahead. Good morning, Your Honors. May it please the Court. I'm Brad Alston. I'm representing Mr. Ronald Fawcett, who has unfortunately now passed away, and I now represent his widow, Ms. Irene Fawcett. I don't have a lot of time. I wanted to really focus on the medical merits of this claim, but I'm happy to answer any questions that you may have of me regarding regulation. Well, on the medical merits, even if the ALJ and the Board didn't rely on the supplemental report, it may well have affected how they viewed the original report since it rehabilitated that. If they just had the original report and the deposition, they may not have given much credence to the original report. I gather that one response made by the Board was that you don't need this particular expert's reports at all because of the oxygenation evidence. But how would you deal with the problem that I just raised? Your Honor, I think there's three ways to get to the same answer. I'll give you all three. First of all, like you said, the tables are the tables when it comes to analyzing arterial blood gas testing. The arterial blood gas testing from Dr. Dagan was very low, and it clearly met with the disability tables. That establishes disability. ABGs is one means by which a party can establish disability. Number two, the doctor's original medical opinion with regard to disability is completely separate than the opinion with regard to causation, so I don't want to conflate those two issues. But number three, with regard to the pilot program testimony, and I don't know how much importance this has in this case, but I want to point out that at the formal hearing, I specifically said you should not agree with this pilot program argument, but even if you were to somehow agree with it, I would adopt the supplemental report, and I have room to do so under the evidentiary limitations at 725.414. So I say all three because there's three different ways. So even if the pilot program was unlawful, you say you could have gotten in that supplemental, you could have submitted that supplemental report anyway? Absolutely, Your Honor, and I specifically said that at the hearing. Well, I'm not interested in what you said. I'm interested in what the law is behind that. Absolutely. Well, why did you say you could offer it anyway? So the reason I said that, Judge, is because 20 CFR 725.414 allows each party to submit two medical reports in support of their case. And so at that point in time, I had not submitted my full allotment of those two medical reports. You could submit reports in addition to what the administrative record had shown before that. Is that what you're saying? Absolutely, yes, Your Honor. But the argument about the violation of the APA in the pilot program is that it essentially put the ALJ in an advocacy position to point out the deficiencies in the prior report and to specifically request responses. So even if you adopted that report, you adopted it with the problem that counsel has objected to. Your Honor, I didn't mean to make that point to necessarily say that's the best argument. That's more in the alternative argument. We fully believe that the Department of Labor has the right to perform the actions that it does in the pilot program by getting these supplemental reports. In fact, the Employers Council has regularly argued that physicians are undocumented and unreasoned because they haven't looked at additional evidence that occurred subsequent to the original evaluation. If we really want to get to the true facts of the case in these federal black loan cases, let's let the physicians look at all of the medical evidence and make a reasoned and documented opinion. That's the standard. I want to say one more thing, and I know I'm almost out of time. Oftentimes, these pilot program responses don't always go in favor of the claimants. I think sometimes we forget that. I'm down in the trenches handling these cases every day. So when a subsequent report comes in, and I know I'm almost out of time. I want to finish this thought. When a subsequent report comes in and it's negative to my client, sometimes those DLL physicians change their reports and say, I now find that he's not totally disabled due to pneumoconiosis. So the point of the pilot program is to try to get it right, and the Department of Labor has the right to implement the pilot program. If there's no other questions about the merits of the claim, that's what I was here to discuss. I will say thank you and a pleasure to be here this morning. Thank you. Thank you. I have three quick points. First, concerning the 1972 definition, it is absolutely the case, and we say so on reply brief at pages six to seven, that Mr. Fawcett, in 1971, did not count as a minor, at least for the time that he worked on the service. The pre-1972 definition of minor, 20 CFR 4101110J, applied only to those working, quote, under the surface, performing functions and extracting coal, and working, quote, above the surface, at the mine, preparing the coal so extracted. He did not do that. He was a mechanic. He was working on equipment that might have facilitated mining in general, but he did not prepare the coal so extracted. In 1971, those were not even qualifying years of minor employment. Number two, there were not— He worked at the tipper? He worked at the tipper for two years. And that's where they're loading it into cars? So that might have been so extracted. Is that part of preparing the coal? Perhaps, but repairing equipment, which is really the central feature here, absolutely has nothing to do with preparing the coal so extracted. Second, the Ramaj split. This court has made clear it is not afraid to get the law right, and Marlow, it's a part of the Ninth Circuit's decision in the Oregon case. You don't need to spend your time on that. We're quite aware of that. The third feature, Judge, is that the agency talking about the pilot program, they don't defend this. This is not legal. It completely subverts the regulation, and they're trying to say, well, there's a harmless error here, so you don't have to get to the merits of this. That's a real problem. We have challenged this program. On page 36, the program as a whole is violating the NPA, and it did prejudice us here, both because we were disenfranchised and because we do not know what the judge would have said if not for that third rehabilitative report where Dr. Gagin completely contradicted his own sworn deposition testimony. For those reasons, we ask you to reverse. Thank you. Thank you. Thank you. Thank you, counsel. Case is submitted. Counsel are excused.